## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

VITAL PHARMACEUTICALS, INC.,
d/b/a VPX and as BANG ENERGY, a
Florida Corporation,

      Plaintiff,

v.

MONSTER BEVERAGE CORPORATION,
a Delaware Corporation,
MONSTER ENERGY COMPANY, a
Delaware Corporation, and RODNEY
CYRIL SACKS, an individual.

      Defendants.

Case No.:

## COMPLAINT

Plaintiff Vital Pharmaceuticals, Inc., d/b/a VPX and as Bang Energy ("VPX" or "Plaintiff")
sues Defendants, Monster Beverage Corporation ("Monster Beverage Co."), Monster Energy
Company ("Monster Energy Co.")  (collectively, "Monster"), and Rodney Cyril Sacks
("Defendant Sacks") and alleges:

## INTRODUCTION

1.    Monster manufactures and sells so-called "energy" drinks, including, among other
product SKUs, its flagship ready-to-drink ("RTD") green "M-Claw" product—a sugar-laden,
carbonated energy drainer (the "M-Claw") depicted below:



2.      VPX brings this action to confront, and seek redress for, Monster's decades of wanton malevolence, including (i) unfairly competing and falsely advertising the nature and attributes of its products, (ii) continuing to wreak grievous physical harm upon consumers by ignoring reports of that its products are hazardous, even potentially lethal, (iii) abusing judicial and arbitral processes as an anticompetitive tactic, and (iv) rank "trademark bullying," all in derogation of free and fair marketplace competition and at the direct behest of its ruthless (co-) CEO, Rodney Cyril Sacks, acting alone or in concert with others.

3.      The claims that VPX herein asserts against Monster and Sacks sound in Unfair Competition and False Advertising Under 15 U.S.C. § 1125, Violation of the Florida Unfair and Deceptive Trade Practices Act and Common Law Unfair Competition.

## THE PARTIES

4.      Plaintiff VPX is a Florida corporation with its principal place of business at 1600 N. Park Drive Weston, Florida 33326.

5.      Defendant Monster Beverage Co. is a Delaware corporation with its principal place of business at 1 Monster Way, Corona, California 92879.

6.      Defendant Monster Energy Co. is a Delaware corporation with its principal place of business at 1 Monster Way, Corona, California 92879.  Monster Energy Co. is a subsidiary of Monster Beverage Co., through which Monster Beverage Co. conducts business.

7.     Sacks has served as the Chairman of the Board of Monster, Chief Executive Officer, and a Director of Monster from November 1990 to present. Sacks is a resident of Laguna Beach, California, in Orange County, California.

8.     Defendant Sacks personally oversees all of Monster's significant corporate operations, including product development, quality control, manufacturing, distribution, marketing, advertising, media, public relations, and litigation prosecutorial, strategic and tactical decision-making and approval. Sacks is an integral part of Monster's day-to-day operations and has been for decades.

## JURISDICTION AND VENUE

9.     This is an action for unfair competition and false advertising under 15 U.S.C. § 1125. As such, this Court possesses subject matter jurisdiction pursuant to 15 U.S.C. § 1121 ("[t]he district and territorial courts of the United States shall have original jurisdiction . . . of all actions arising under this chapter").

10.     Subject matter jurisdiction also is proper pursuant to 28 U.S.C. § § 1331, 1338(a), and 1338(b). This Court also has subject matter jurisdiction pursuant to 15 U.S.C. § 1121; the doctrine of supplemental jurisdiction, as set forth in 28 U.S.C. § 1367; and 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

11.     This Court has personal jurisdiction over Defendants Monster and Sacks pursuant to Section 48.193(1)(a), Florida Statutes, because Defendants Monster and Sacks, personally and through their agents, among other things:

    a.     Operated, conducted, engaged in, or carried on a business or business venture in Florida; and,

    b.     Committed a tortious act within this state by falsely advertising their signature

3

product – Monster Energy – in this District, and VPX's claims arise from those activities.

12.     This Court also has personal jurisdiction over Defendants Monster and Sacks pursuant to section 48.193(2), Florida Statutes, because, among other things, Monster and Defendant Sacks engaged in substantial and non-isolated activity in Florida.

13.     Based upon the foregoing conduct, the exercise of personal jurisdiction over Defendants Monster and Sacks satisfies traditional notions of fair play and substantial justice under the Fourteenth Amendment of the United States Constitution.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

15.     Established in 1993, VPX is one of the leading manufacturers, distributors, and sellers of energy drinks and dietary supplement products.

16.     For more than a decade, VPX's bestselling products have included Bang® RTD, a carbonated, caffeinated, sugarless beverage sold in a "pop-top" can and available in several different flavors (the "Bang® RTD"").

17.      Bang® RTD products are a true energy drink product purchased by active-lifestyle and fitness-driven consumers.

18.     Unlike other energy drinks on the market (including the M-Claw and other Monster product SKUs), the Bang® RTD drink products contain no sugar or other carbohydrates

19.     Among VPX's competitors are Monster, which promotes its signature product, the M-Claw, among other Monster product SKUs, in competition with Bang® RTD products in the marketplace.

<u>*MONSTER & SACKS: CHEATERS AND FALSE ADVERTISERS*</u>

20.      Monster's advertisement of M-Claw as an "energy" drink that will "unleash the beast" and provide a "big bad buzz", preys on consumers by causing them to believe that the M-Claw offers a mixture of ingredients that, when ingested, result in a sustained increase in energy and that no subsequent crash will negatively affect their energy and performance.

21.      Although caffeinated, the M-Claw is, in reality, an *anti-energy* drink that is a sugar-loaded, crash-inducing soda pop, the consumption of which provides no sustained energy, provides an overall net decrease in energy, and results in a subsequent crash that negatively affects consumers' energy and performance and health. Indeed, according to publicly available adverse incident reports, the consumption of M-Claw and related Monster product SKUs have been cited as a suspected cause of illness and even death on numerous occasions. *See* Monster related CFSAN adverse event reports attached hereto as Exhibit A.

22.      In 2002, Monster introduced into the market their signature *Monster Energy* product – a carbonated, caffeinated and sugar-loaded RTD beverage sold in a "pop-top" can – which Monster label and promote as an "energy" drink:



23.      For two decades, Monster has misled consumers about the effects of the M-Claw

and its ability to "unleash the beast" and provide energy and vitality to its consumers.  According to Monster's website the M-Claw offers "a powerful punch" and "the ideal combo of the right ingredients in the right proportion to deliver the ***big bad buzz*** that only Monster can."[1]

24.     Monster has promoted the M-Claw through a campaign of advertisements and affiliations with extreme action sports, such as motocross, skiing and snowboarding, skateboarding, mixed martial arts, Formula 1, and other endeavors typically associated with athleticism, speed, rage, and of course, *energy*.

25.     Indeed, Monster's advertisements are designed to target consumers interested in these forms of sport and entertainment, implying to their prospective consumers, both directly and indirectly, that drinking the M-Claw will enhance their performance abilities and "unleash the beast" within them.[2]

26.     Such advertisements even portray that drinking the M-Claw will unlock a source of performance, ability, and power that would otherwise be unavailable to them.

---

[1] *See Monster Energy*, https://www.monsterenergy.com/us/en/products/monster-energy (last accessed Aug. 24, 2022) (emphasis added).
[2] *See* The Brandgym, *Monster "Unleash the Beast" to Challenge Red Bull – Brilliant Brand Ideas 1*, https://thebrandgym.com/monster-unleashing-the-beast-to-challenge-red-bull/ (last accessed Aug. 30, 2022).





27.     According to Monster the M-Claw is the "the meanest energy drink on the planet,"

providing consumers with the *key* to accessing the energy of a "beast."



28.     Despite its name, imaging, associations, tag lines, and motto, however, the M-Claw does not provide consumers with the energy it claims to offer.  In fact, it does the exact opposite.

29.     The M-Claw actually **_decreases_** consumers' overall energy, rather than increase it. Instead of a _big bad buzz_, all consumers are left with is a big bad crash.

30.     A single can of the M-Claw contains a whopping 58 grams of carbohydrates, of which 54 grams are made up of "added sugars."  Ingredients listed within the M-Claw label include "sugar," "glucose," and "maltodextrin."[3]

---

[3]     Additionally, as if the 58 grams of added sugar were not already enough, according to its Nutrition Facts, each can of Monster Energy also contains unknown amounts of sucralose to make the drink all the "sweeter" to its consumers. _See_ https://www.healthdigest.com/597244/are-monster-energy-drinks-bad-for-you. (last accessed Aug. 30, 2022).

MONSTER GREEN 16 FL. OZ.

**Nutrition Facts**

Serving size ... 1 can

Amount per serving

**Calories** 230

| | % Daily Value* |
|---|---|
| **Total Fat** 0g | 0% |
| **Sodium** 370mg | 16% |
| **Total Carbohydrate** 58g | 21% |
| Total Sugars 54g | |
| Includes 54g Added Sugars | 108% |
| **Protein** 0g | |
| Riboflavin (Vit. B2) | 260% |
| Niacin (Vit. B3) | 250% |
| Vitamin B6 | 240% |
| Vitamin B12 | 500% |

Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.

*The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

INGREDIENTS: CARBONATED WATER, SUGAR, GLUCOSE, CITRIC ACID, NATURAL FLAVORS, TAURINE, SODIUM CITRATE, COLOR ADDED, PANAX GINSENG EXTRACT, L-CARNITINE L-TARTRATE, CAFFEINE, SORBIC ACID (PRESERVATIVE), BENZOIC ACID (PRESERVATIVE), NIACINAMIDE (VIT. B3), SUCRALOSE, SALT, D-GLUCURONOLACTONE, INOSITOL, GUARANA EXTRACT, PYRIDOXINE HYDROCHLORIDE (VIT. B6), RIBOFLAVIN (VIT. B2), MALTODEXTRIN, CYANOCOBALAMIN (VIT. B12).

MANUFACTURED FOR MONSTER ENERGY COMPANY
1 MONSTER WAY, CORONA, CA 92879 U.S.A.
© 2012 MONSTER ENERGY COMPANY

**MONSTER ENERGY BLEND:** GLUCOSE, TAURINE, PANAX GINSENG EXTRACT, L-CARNITINE, CAFFEINE, GLUCURONOLACTONE, INOSITOL, GUARANA EXTRACT, MALTODEXTRIN

**CAFFEINE FROM ALL SOURCES:** 160mg PER CAN

**CONSUME RESPONSIBLY:** NOT RECOMMENDED FOR CHILDREN, PEOPLE SENSITIVE TO CAFFEINE, PREGNANT WOMEN OR WOMEN WHO ARE NURSING.

*See* Walmart, *Monster Energy Drink, Original, 16 fl oz,*

https://www.walmart.com/ip/Monster-Energy-Green-Original-Energy-Drink-16-fl-oz/12018560

(last accessed Aug. 30, 2022).

31.     As recent studies have demonstrated, the M-Claw does not have an impact on athletic benchmarks, such as increasing ride time-to-exhaustion or an improvement of treadmill exercise performance.[4]  Indeed, the M-Claw's high sugar and carbohydrate content actually causes consumers to experience a sugar crash, resulting in higher levels of fatigue following consumption.

---

[4]     *See* Gabriel J Sanders, Willard Peveler, Brady Holmer and Corey A Peacock, *The effect of three different energy drinks on oxygen consumption and perceived exertion during treadmill exercise*, Journal of the International Society of Sports Nutrition (Sept. 21, 2015), https://jissn.biomedcentral.com/articles/10.1186/1550-2783-12-S1-P1 (last accessed Aug. 30, 2022).

9

That is, it decreases – not increases – one's overall net energy.[5]

32.     Such deceptive conduct and practices in Monster's advertisements on the part of Defendants is not mere "puffery," but is instead deceptive, fraudulent, and actionable.

33.     At all relevant times, Monster has made, and continue to make, false, misleading, and disingenuous representations regarding the M-Claw and other Monster product SKUs– both on the face of the product itself, as well as through other forms of marketing and advertisements.

34.     Specifically, the M-Claw was, and continues to be, advertised and marketed as "the meanest energy drink on the planet," when it, in fact, fails to provide a sustained energy increase, leads to a substantial crash in energy, and actually decreases a consumer's overall net energy:



       *See* M-Claw Product Description, *Monster Energy - The Original Green Monster Energy*, https://www.monsterenergy.com/us/en/products/monster-energy/monster-energy  (last  accessed Aug. 30, 2022).

**"*Unleash the Beast*", But Not Really**

---

[5]     *See* Konstantinos, et al., *Sugar rush or sugar crash? A meta-analysis of carbohydrate effects on mood*, Neuroscience &b Biobehavioral Reviews, Volume 101, Pages 46-67 (June 2019), (last accessed Aug. 24, 2022) (discovered lower levels of alertness and higher levels of fatigue after the first hour of consumption of so-called "energy" drinks including Monster Energy).

35.   Monster has strategically utilized media, athletes and celebrities to ensure their false, deceptive, and misleading marketing reaches a broad consumer base.

36.   Associating their catch phrase "unleash the beast" with some of the greatest athletes and entertainers in the world, Monster has effectively deceived consumers into believing the M-Claw will elevate them to achieve "beast mode" with a "big bad buzz."

37.   Examples of such false, misleading, and disingenuous representations and advertisements include:

   a.   Portraying athletes such as Kamaru Usman, a professional mixed martial artist, stating he is "Monster Made."[6];

   b.   Advertising a new collaboration between Monster and rapper/actor Ice Cube to "bring a whole new ENERGY" to the NBA's "BIG3"[7]; and,

   c.   Associating the heavy consumption of M-Claw and other Monster products with action sports and the "beast mode" vibe.[8]

---

[6]   See https://twitter.com/MonsterEnergy/status/1454840595952726017?s=20&t=vT7S0QdKbKFQl1J1neDH6Q (last accessed Aug. 24, 2022)

[7]   *See* https://www.facebook.com/MonsterEnergy/photos/10159401501540827(last accessed Aug. 24, 2022).

[8]   *See* https://twitter.com/MonsterEnergy/status/1466542795540209667/photo/1(last accessed Aug. 24, 2022)





38.     In fact, Monster goes so far as to declare that the M-Claw has extreme lifestyle benefits, claiming it is not just an energy drink, but a creation to back the next generation of future musicians and athletes. *See* About Us Page Screenshot attached hereto as Exhibit B.

39.     In truth, however, the M-Claw fails to even deliver the most basic benefit that Monster's claim to offer their consumers – sustained energy and overall net increase in energy – much less "unleash" any sort of "beast" or provide any kind of "big bad buzz".

12

***Big Bad Buzz Or Big Bad Crash?***

40.     Indeed, recent studies have established that the M-Claw has a negative effect on consumers' energy levels.[9]

41.     That is, although purporting to be an "energy" drink that can provide its consumers with a "morning hitter," "mid-day pick me-up," or "afternoon warrior,"[10] the M-Claw actually does no such thing.  *Id.*



42.     Instead, various studies have demonstrated that the M-Claw leaves its consumers experiencing a *big bad* sugar-crash, as well as other serious adverse health consequences as a result of the excess sugars and carbohydrates the product contains.  *Id.*

43.     Monster undoubtedly was, and continues to be, aware of these facts as is evidenced by Monster's past deliberate efforts to downplay the density of Monster Energy's per can sugar content by formerly breaking down its Nutrition Facts panel into two separate serving sizes, despite

---

[9]      See Konstantinos, et al., supra note 3; see also Fletcher E., et al., Randomized Controlled Trial of High-Volume Energy Drink Versus Caffeine Consumption on ECG and Hemodynamic Parameters, J Am Heart Assoc. (Aug. 24, 2022).
https://www.ahajournals.org/doi/pdf/10.1161/JAHA.116.004448 (last visited Aug. 24, 2022).
[10]      See https://twitter.com/MonsterEnergy/status/1427291630164344836 (last accessed Aug. 30, 2022).

the fact that it is a carbonated "pop-top" beverage product:



Given that carbonated pop-top beverage products were inherently limited to one serving per can at the time Monster introduced the bifurcated Nutrition Facts panel, it is apparent that Monster configured the Nutrition Facts panel as such in a deliberate attempt to boost the sales of M-Claw.

44.     In addition to the false and deceptive representations on the product packaging itself, Monster also use social media to underscore their message that the M-Claw gives you a "big bad buzz" and will "unleash the beast" – all resulting in the false and deceptive message that the M-Claw, and other Monster Energy products, provide a sustained increase in energy, no subsequent crash, and an increase in one's overall net energy.

45.     Monster's false and deceptive representations in its advertisements deliberately attack other energy drink competitors, including even VPX despite its clean safety records. Monster advertises its M-Claw as, "the meanest energy drink on the planet. It is the ideal combination of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can. Monster packs a powerful punch but has a smooth easy drinking flavor." *See* About Us Page Screenshot attached hereto as Exhibit B.

46.     However, such acts come at the expense and detriment of past, present, and future consumers, as well as the energy drink industry alike, including but not limited to VPX, since Monster's advertisements as evidenced by Exhibit B dishonestly falsely and duplicitously suggest that Monster products are superior to its energy drink competitors.

47.     Monster should not be permitted to perpetuate false information about the M-Claw and other Monster product SKUs.  VPX brings this action to prevent Monster from continuing to do so and requests Monster's adverse conduct to immediately cease.

### MONSTER & SACKS: RECKLESS PEDDLERS OF HEALTH HAZARDOUS PRODUCTS

48.     Furthermore, Monster products' outlandish levels of sugar have been found to lead to severe health consequences, including but not limited to, serious effects on a consumers' cardiovascular system.[11]

49.     New discoveries continue to show the negative health effects of the "consumption of sugar-laden energy drinks," such as the M-Claw and other Monster product SKUs, including an increased risk for kidney disease and failure.[12]

50.     In fact, since 2004, suspected links between consumption of Monster's products and no less than 20 deaths, 10 heart attacks, and over 120 adverse health events have been reported to the F.D.A.[13] *See* Exhibit C list of all Monster adverse health events.

---

[11]   *See e.g.,* AHA recommendations: Drinking a lot of liquid sugar may lead to insulin resistance, metabolic syndrome, type 2 diabetes, and fatty liver disease. https://www.webmd.com/diet/what-to-know-liquid-sugar (last accessed Aug. 25, 2022)

[12]   *See Energy Drink Lawsuit*, https://www.schmidtandclark.com/energy-drink-lawsuit (last accessed Aug. 24, 2022) ("A new study from Johns Hopkins Bloomberg School of Public Health has identified yet another link between the consumption of sugar-laden energy drinks and a risk for kidney disease and heart attack emergency room visits.").

[13]   *See* https://www.fda.gov/Food/ComplianceEnforcement/ucm494015.htm (last accessed Aug. 24, 2022) (identifying consumer reports of suspected links between consumption of Monster

51.     Monster, of course, has knowledge of such information, but obscures and muffles it with false and deceptive advertising practices and baseless misrepresentations that their products are safe.

52.     Despite being aware of such adverse, even potentially lethal health risks, Monster nonetheless continues to disseminate and tout false information about its products at the expense of their consumers' energy and health, as well as the energy drink industry as a whole – including VPX.

53.     During the 2012 F.D.A. investigation of adverse health reports associated with Monster Energy Products (including five deaths in 2012)[14], Sacks continuously defended Monster and falsely assured the public, "Once again, and first and foremost, we reiterate that Monster's products are safe," [15] knowing, in fact, that Monster's products had caused five deaths and would

---

products and adverse health evenings including fatigue, high blood pressure, irregular cardio responses including cardiac arrest, and even multiple deaths). *See also*, Exhibit C.
Examples of such complaints include:

- June 14, 2006 – 19 year old male hospitalized with vomiting, rhabdomyolysis, myoclonus, dyspnea, and chest pain.
- December 8, 2011 – 25 year old male hospitalized with irregular heart rate, atrial fibrillation, and dyspnea.
- January 3, 2012 – 45 year old male dies following Monster Energy consumption.
- April 9, 2012 – 14 year old girl dies of cardiac arrest following Monster Energy consumption.
- April 26, 2018 – 30 year old male dies of cardiac arrest following Monster Energy consumption.

[14] In 2012 senators Dick Durbin of Illinois and Richard Blumenthal of Connecticut, as well as House of Representatives member Edward J. Markey of Massachusetts, had requested the Food and Drug Administration investigate the safety and advertising of energy drinks such as Monster. Ultimately, the F.D.A. reports did not represent any conclusion about whether the products caused the adverse events.
[15] Monster Beverage C.E.O. defends Energy Drinks' safety. *See* https://www.foodbusinessnews.net/articles/772-monster-beverage-c-e-o-defends-energy-drinks-safety#:~:text=house%2C%E2%80%9D%20Mr.,Sacks%20said.,are%20safe%2C%E2%80%9D%20he%20said (last accessed Aug. 30.2022)

continue to cause deaths. Although fatalities had already occurred, Sacks diverted the public's attention to the numbers, "Tens of billions of energy drinks have been consumed safely over the past 25 years, including 8 billion Monster Energy drinks since 2002."[16]

54.     Sacks himself perpetuated Monster's deceit by publicly announcing the safety of Monster's products without bona fide evidentiary support in the face of F.D.A scrutiny. *See* Sacks announcing publicly at shareholder's meeting, picked up by press, that Monster products are safe despite F.D.A 2012 investigation into five suspected Monster-caused deaths. [17]

55.     After the 2012 F.D.A investigation, Monster and Sacks informed the public that Monster would not alter the company recipe despite the five reported deaths caused by Monster's products.

56.     On July 31, 2013, Sacks testified before the Senate assuring the public and senate that, "Monster is, and has always been, committed to ensuring that all of the ingredients in its energy drinks (including caffeine) are safe and in regulatory compliance for their intended use."[18]

57.     Monster has used these misleading advertisements to obscure their products extreme health threats and fatalities from the public at large. The FDA website contains a publicly available list of Monster related fatalities and adverse health effects. To date, there have been at least nineteen reported deaths, ten heart attacks, and approximately one hundred AERs. [19] *See*

---

[16] *Id.*

[17] *See* https://www.ocregister.com/2013/06/18/creating-a-monster-building-a-lifestyle-in-a-can-brand/ (last accessed Aug. 31, 2022)

[18] *See* July 31, 2013 written testimony of Rodney Sacks before U.S. Senate. https://www.commerce.senate.gov/services/files/3D8EB9DB-8489-49DE-BDAD-293A3A9174F3 (last accessed Aug. 31, 2022)

[19] *See* https://www.fda.gov/Food/ComplianceEnforcement/ucm494015.htm (last accessed Aug. 24, 2022) (identifying complaints submitted by consumers relating to use of M-Claw, including fatigue, high blood pressure, irregular cardio responses including cardiac arrest, and even death – with approximately 19 reported deaths since October 26, 2007).

Monster suspected links to fatalities attached hereto as Exhibit C. *See also* Exhibit A.

58.     The first reported suspected link between consumption of Monster's products and death occurred on or around October 26, 2007. Between October 26, 2007, through July 1, 2012, five additional deaths suspected of being linked to consumption of Monsters' products were reported. Despite the fatalities, Monster continues to advertise their products without warning consumers of the negative health effects. *See* Exhibit A and C.

59.     On or around 2012, the F.D.A investigated Monster as a result of the five reported deaths. Despite the investigation, Monster and Sacks failed to reformulate their products and continued to employ the same deceptive advertising techniques without warning to the public. As a result, between 2012 until present, 15 additional Monster related fatalities have occurred. *See* Exhibit A and C.

60.     As a result of Monster's and Sack's continued false, misleading, and disingenuous representations relating to the M-Claw and other Monster product SKUs, VPX and other competitive energy drink companies have sustained, and will continue to sustain damages.

61.     In addition, unless halted by this Court, Monster and Sacks will continue making false and misleading representations and will continue to induce reasonable consumers into making misinformed purchasing decisions, not only resulting in an unwelcome, unanticipated crash and overall decrease in energy, but potentially exposing consumers to adverse and fatal health consequences.

### *MONSTER & SACKS: VEXATIOUS ABUSERS OF JUDICIAL AND ARBITRAL PROCESSES*

62.     Litigants in more than 1600 cases, Monster and Sacks are vexatious abusers of judicial and arbitral processes, using litigations, and its ample resources to fund them, to bully others, including competitors against whom Monster and Sacks misuse lawsuits as a means of

trying to destroy free and fair marketplace competition.

63. In a stark example, Monster actually had an arbitration award against a distributor overturned by a federal appellate court because the presiding arbitrator had an undisclosed ownership interest in the underlying arbitration organization of which Monster was a highly litigious repeat customer, thus evidencing bias in favor of Monster.[20]

64. Monster actually had an arbitration award against a distributor overturned by a federal appellate court because the presiding arbitrator had an undisclosed ownership interest in the underlying arbitration organization of which Monster was a highly litigious repeat customer, thus evidencing bias in favor of Monster.

### *MONSTER & SACKS: TRADEMARK BULLIES*

65. Monster also has been identified as the number one "All Time Biggest [Trademark] Bull[y]" by *Trademarkia*, which publicly lists a legion of trademark proceedings in which Monster picked on small companies and individuals, many of whom were not even in the beverage business.[21]

66. All conditions precedent to the filing of this action have been satisfied, waived, or would be futile to perform.

### COUNT I

### VIOLATION OF SECTION 43 OF THE LANHAM ACT, 15 U.S.C. § 1125(a)
### (against Monster and Sacks)

67. VPX re-alleges and incorporates the allegations of paragraphs 1 through 66 as if fully set forth herein.

---

[20] *See Monster Energy Company vs. City Beverages, LLC*, 940 F.3d 1130 (9th Cir. 2019)

[21] https://www.trademarkia.com/opposition/bully-monster-energy-company?fn=Monster%20Energy%20Company [trademarkia.com]

68.     Monster has made and distributed, in interstate commerce and in this District, advertisements that contain false or misleading statements of fact regarding their signature M-Claw product and other Monster product SKUs.  Such advertisements contain actual misstatements and/or misleading statements, including among others, the statements that Monster's product can provide consumers with a "big bad buzz" and "unleash" their inner "beast", resulting in a sustained increase in energy, overall net increase in energy, and no subsequent crash.

69.     Defendant Sacks has participated, ratified, and/or directed the campaign of Monster's false advertisements, including, but not limited to, falsely, dishonestly and mendaciously proclaiming the safety of Monster's products.

70.     Monster and Defendant Sacks have made, controlled, or ratified false or misleading statements of fact in commercial advertising or promotion, and misrepresented the nature, characteristics, and qualities of their M-Claw product and other Monster product SKUs.

71.     These false statements actually deceive or confuse, or have a tendency to deceive or confuse, consumers as well as potential consumers. This deception/confusion is similarly material in that it is likely to influence the purchasing decisions of VPX's consumers and potential consumers.

72.     Monster's and Sacks' false and misleading advertising statements and omissions injure both consumers and VPX.

73.     As such, Monster and Sack's false and misleading advertising violate the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

74.     Because Monster and Sacks' have caused, and will continue to cause, irreparable injury to VPX for which there is no adequate remedy at law, VPX is entitled to injunctive relief under 15 U.S.C. § 1116, including but not limited to, an order restraining Monster and Rodney

Sacks, their agents, employees, representatives, or anyone acting on their behalf, from engaging in further acts of false advertising, and ordering Monster to remove all false advertisements immediately.

75.     Additionally, pursuant to 15 U.S.C. § 1117, VPX is entitled to recover from Monster and Rodney Sacks for the damages sustained by VPX as a result of Monster's and Sacks' acts in violation of the Lanham Act.

76.     VPX is also entitled to recover the gains, profits, and advantages that Monster and Sacks have obtained through their acts, pursuant to 15 U.S.C. § 1117.

77.     Finally, VPX is entitled to recover for the costs of this action, as well as attorney's fees in this exceptional case.

**WHEREFORE**, Plaintiff VPX requests judgment against Monster and Sacks, jointly and severally, for actual damages (including, but not necessarily limited to, lost profits), disgorgement of profits, a declaratory judgment that Monster's and Sacks' actions violate Section 43 of the Lanham Act, entry of a preliminary and permanent injunction prohibiting all such further conduct, interest as allowed by law, attorney's fees, costs, as well as any other relief this Court deems just and proper.

## COUNT II

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, CHAPTER 501, PART II, FLORIDA STATUTES
**(against Monster)**

78.     VPX re-alleges and incorporates the allegations of paragraphs 1 through 66 as if fully set forth herein.

79.     Florida Statutes Section 501.204(1) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  The provisions

of the Act shall be "construed liberally to promote" the protection of the "consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

80.     Monster was, and is, at all material times to the allegations herein, engaged in "trade and commerce" as defined by the Act. § 501.203, Fla. Stat.   Specifically, Monster markets, advertises, and sell their products, including but not limited to, its signature M-Claw product and other Monster product SKUs.

81.     Specifically, since 2002, Monster had made and continues to make false and misleading representations of fact regarding the nature, characteristics, effects, and quality of their signature product, M-Claw and other Monster product SKUs by:

  a.  Falsely and deceptively asserting that the product will provide you with a "big bad buzz" and "unleash the beast" when, in fact, it provides no sustained increase in energy and instead actually decreases one's overall net energy and results in a substantial crash;

  b.  Falsely and deceptively labeling the product as an "Energy Drink" when, in fact, it provides no sustained increase in energy and instead actually decreases one's overall net energy and results in a substantial crash;

  c.  Falsely and deceptively associating the product with pro athletes and athletic events on social media platforms such as Facebook, Instagram, and Twitter, which also suggests an increase in overall net energy and performance;

  d.  Falsely and deceptively labeling the product as the "ideal combo of the right ingredients in the right proportion to deliver the "big bad buzz that only Monster

can;" and,

e. Failing to warn consumers of health effects caused by consumption of the product.

82.     Monster has made such false and deceptive statements through marketing and promotional materials on the face of the product, social media platforms, Monster's website, and other publications.

83.     Monster has been willfully obstructive to other beverage competitors and deceived the public's perception of same by continuing to fulfill its reputation as the "All Time Biggest [Trademark] Bull[y]" by *Trademarkia*, which publicly lists a legion of trademark proceedings in which Monster picked on small companies and individuals.

84.     Monster's conduct is, and was misleading, immoral, unethical, oppressive, unconscionable, and unscrupulous, and has mislead and deceived consumers acting reasonably under the circumstances, to the consumers' and Bang's detriment.

85.     Monster knew the conduct described herein was misleading and deceptive when they made the false and deceptive statements.

86.     As a result of Monster's actions, Plaintiff has been damaged.

**WHEREFORE**, Plaintiff VPX requests judgment against Monster for actual damages (including, but not necessarily limited to, lost profits), a declaratory judgment that Monster's actions violate the Florida Deceptive and Unfair Trade Practices Act, entry of a preliminary and permanent injunction prohibiting all such further conduct, interest as allowed by law, attorney's fees, costs, as well as any other relief this Court deems just and proper.

## COUNT III

## COMMON LAW UNFAIR COMPETITION
### (against Monster and Sacks)

87.     VPX re-alleges and incorporates the allegations of paragraphs 1 through 66 as if

fully set forth herein.

88.     Monster has made, published, disseminated, and circulated false, deceptive, misleading statements, representations, and advertisements misrepresenting the nature, quality, effects, and characteristics of their signature product, the M-Claw and other Monster product SKUs, with the intent to sell, distribute, and increase the consumption of, and interest in, the M-Claw product and other Monster product SKUs.

89.     Defendant Sacks has participated, ratified, and/or directed the campaign of Monster's false advertisements, including, but not limited to, falsely, dishonestly and mendaciously proclaiming the safety of Monster's products.

90.     Monster's and Sack's conduct as described herein, constitutes unlawful, unfair, and/or deceptive practices.

91.     Specifically, the advertising associated with the M-Claw and other Monster product SKUs, misleads consumers into believing that the product will "unleash the beast" and provide a "big bad buzz" within them, resulting in a sustained energy increase and an overall increase in net energy with no subsequent crash, when it in fact, it does not.

92.     Monster has been willfully obstructive to other beverage competitors and deceived the public's perception of same by continuing to fulfill its reputation as the "All Time Biggest [Trademark] Bull[y]" by *Trademarkia*, which publicly lists a legion of trademark proceedings in which Monster picked on small companies and individuals.

93.     As a direct and proximate result of Monster's and Sack's improper conduct, VPX has suffered losses which include damage to VPX's goodwill with its current, former, and future consumers.  Furthermore, Monster's and Sack's improper conduct has also caused direct damage to its consumers.

94.     Such acts by Monster and Sacks have caused, and will continue to cause, VPX damages, including but not limited to, dilution of goodwill, loss of consumers, confusion to current and future consumers, and diminution of value to VPX's products. The damage such acts will cause to VPX are both imminent and irreparable, and the amount of damage sustained by VPX will be difficult to ascertain if such acts continue.

95.     As a result of the improper acts of Monster and Sacks, VPX is entitled to punitive damages, as well as an injunction restraining Monster and their agents, employees, representatives, or anyone acting on their behalf from engaging in further unlawful conduct.

**WHEREFORE**, Plaintiff VPX requests judgment against Monster and Sacks, jointly and severally, for actual damages (including, but not necessarily limited to, lost profits), disgorgement of profits, entry of a preliminary and permanent injunction prohibiting all such further conduct, interest as allowed by law, as well as any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, VPX hereby demands a trial by jury on all issues and claims so triable.

/s/ Gregg H. Metzger
Gregg H. Metzger, Esq.
Florida Bar No. 836850
Vital Pharmaceuticals, Inc.
 1600 North Park Drive
Weston, Florida 33326
Telephone: (786) 417-0104
Email: Gregg.Metzger@bangenergy.com


 /s/ Alexander Angueira
 Alexander Angueira, Esq.
 Florida Bar No. 0716091
 Vital Pharmaceuticals, Inc.
 1600 North Park Drive
 Weston, Florida 33326

Telephone: (305) 915.0475
Email:  Alexander.angueira@bangenergy.com

*/s/ Aileen M. Carpenter*
Aileen M. Carpenter, Esq.
FBN: 1035905
Vital Pharmaceuticals, Inc.
1600 North Park Drive
Weston, Florida 33326
Phone: 954-579-7291
Facsimile: 954-389-6254
Email: Aileen.Carpenter@bangenergy.com

[This portion was intentionally left blank.]